600 P.2d 822

Evelyn M. GEORGE, As Executrix of the Estate of Pearl George and Emma Dick Reed aka Emma Dick, Deceased,

v.

Byron CATON and Fred E. White, Defendants-Appellees.

No. 3375.

Court of Appeals of New Mexico.

March 6, 1979.

**372**

Laura M. Goldsmith, Window Rock, Ariz., for plaintiff-appellant.

George J. Hopkins, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for defendants-appellees.

## OPINION

SUTIN, Judge.

This suit was brought to recover damages for losses sustained when defendants, as attorneys for Pearl George and Emma Dick, deceased, failed to file plaintiff's wrongful death action before expiration of the statute of limitations. Defendants' motion for summary judgment was granted because,

based on principles of contract law, no attorney-client relationship was established. Plaintiff appeals. We reverse.

A. *Issues raised in the trial court.*

Plaintiff sued defendants on two counts:

(1) Defendants, as attorneys for plaintiffs failed to bring suit within three years and negligently allowed the statute of limitations to run; that defendants failed to exercise the degree of care required by members of the legal profession.

(2) As a result of representations of Caton, plaintiff assumed that defendants agreed to represent plaintiff and if they did not, defendants had a duty to put plaintiff on notice that they were unwilling to represent her, or in the alternative, defendants were under a duty to file the action prior to the effective date of the statute of limitations.

Defendants filed an answer, a motion for summary judgment, together with an affidavit of a Farmington lawyer. The affidavit stated that:

1. The standard and custom of the legal profession in Farmington is to obtain from a prospective client prior to, and as a condition of employment in contingent fee plaintiff's cases, a written employment agreement together with an advanced deposit of costs.

2. If an attorney informs a prospective contingent fee client that the case would be handled, and the client contacts the attorney once six months later, and not thereafter for 2½ years, in the absence of a written agreement the standards of skill, competence and practice would not require the attorney to file the complaint on the attorney's own initiative, even though the limitation period expired; that no negligence would occur; that the filing of the complaint by the attorney would fall below the standards of practice and ethics.

3. It would not fall below the standards for the attorney to fail or refuse to attempt to seek out the potential plaintiff, even if the prospective plaintiff was a Navajo and resided on the Navajo reservation.

4. The assumption or conclusion by the attorney that the potential plaintiff had either obtained other counsel, or had abandoned the lawsuit, would not fall below the standards.

Seventeen depositions were taken. We assume that the transcript of the record contains the entire record below. No order in writing from plaintiff to the clerk of the district court appears. Neither party requested a jury trial so that the district court is the trier of the fact.

B. *Trial court's letter decision filed of record controls effect of summary judgment.*

■ The district judge wrote the parties: Following the hearing this last Wednesday and Defendant's Motion for Summary Judgment, I reviewed the court file, the memorandums and briefs you each submitted, the deposition testimony that was attached as appendicies to these memorandum briefs and my notes taken at the hearing.

As I indicated during my questioning of each of you at the Wednesday hearing, my primary concern in this case is whether there was an attorney-client relationship established. This meant a contract.

. . .

* * * * * *

I find that no attorney-client relationship existed or could at law be construed to have existed, based upon the above pleadings, affidavits and depositions submitted.

*Defendants' Motion for Summary Judgment will therefore be granted.* [Emphasis added.]

The trial court ordered the letter to be filed of record. *The trial court did not determine the validity of plaintiff's second count.* Defendants contend that the letter is not part of the record proper and should not be considered by this Court on appeal. We disagree.

■ When summary judgment is granted, the trial court is not required to state its reasons nor to make findings. *Garrett v.*

*Nissen Corporation,* 84 N.M. 16, 498 P.2d 1359 (1972). But such findings are permissible and often quite helpful for appellate review. 6 Moore's Federal Practice, ¶ 56.-02(11) (1976). The parties then "know upon what grounds the judgment was granted in order to properly present the controversial issue to the appellate court." *See, Wilson v. Albuquerque Board of Realtors,* 81 N.M. 657, 661, 472 P.2d 371 (1970), *overruled* in *Garrett.*

The only controversial issue now present is the existence or non-existence of an attorney-client relationship.

Nevertheless, we feel compelled to determine whether the trial court erred in entering summary judgment. This will assist in determination of this case on the merits. "[I]n a suit against an attorney for negligence, plaintiff must prove three things in order to recover: (1) the attorney's employment, (2) his neglect of a reasonable duty, and (3) such negligence resulted in and was the proximate cause ·of loss to client." *Freeman v. Rubin,* 318 So.2d 540, 542–43 (Fla.App.1975); *Allied Productions, Inc. v. Duesterdick,* 217 Va. 763, 232 S.E.2d 774 (1977).

C. *A genuine issue of material fact exists on contract issues.*

■ The depositions of White and Caton established a prima facie case that no attorney-client relationship existed. The burden of establishing a genuine issue of material fact shifted to plaintiff.

The facts most favorable to plaintiff are:

In the evening of November 23, 1969, Pearl and Emma expired in a trailer purchased from Lone Star Trailer Sales. Two weeks thereafter, plaintiff was referred to the law firm of White and Caton in Farmington. Caton was an associate of White. But letterheads and business cards read "White and Caton."

The testimony that follows was gleaned from a series of depositions taken in 1976, some seven years after the relationship of the parties began. Plaintiff, a Navajo Indian, could neither speak nor understand the

English language. At her deposition, she spoke through an interpreter. At various visitations with defendants, a member of the family was present who conversed in the English language.

On November 26, 1969, three days after the tragedy, Paul V. Rupp, attorney for DNA enclosed five specified items by letter to Caton, together with information of photographs taken. On December 2, 1969, Rupp enclosed copies of letters written by Bob Smith together with a statement from the Gary Butane Service. Rupp thought the letters might serve as a notice to the sellers of propane.

Plaintiff's first visitation occurred two weeks after the tragic event. It consisted of a conversation with White. Present were plaintiff and her sister. In this conversation White said that it sounded like a good case and he would handle it. He obtained plaintiff's address and said he would write plaintiff a letter within two or three weeks. There was no discussion about a fee arrangement or contract of employment. No letter was ever received by plaintiff from defendants.

In January or February, 1970, Caton or White came to the office of Edward Boggio, Criminal Investigator for the Bureau of Indian Affairs at Shiprock and examined photographs and a ventilation pipe. Conversation centered around the condition of the ventilation pipe. Boggio's information was confidential and Boggio assumed that the attorney was handling the case. Boggio recalled no conversation on the subject of an attorney-client relationship.

Plaintiff's second visitation with White occurred at least six months after the first visit. Present were plaintiff and her brother. White was asked about the case, and he replied: "It's fine. It's doing okay. It's coming out all right." He also explained that there might be a conflict of interest if he were employed by Lone Star Trailer, and if so, he would notify plaintiff. He also said: "If there should be any other attorneys, any other lawyers that should come around to see you where you live at Newcomb and if they ask you to handle the case,

to refuse and say, 'No' to any and all lawyers that come along."

The third visitation occurred in January or February, 1972, beyond the limitation period of three years. A week prior thereto, plaintiff's daughter called White to inquire about the case and was told that the case had "expired." Present at the third visitation was plaintiff, her daughter and son-in-law. White told plaintiff the case was good, but it had "expired;" that a complaint had been filed but it was good for only two years, and that White had sent a letter to plaintiff. Plaintiff requested to see the file of this case but none was shown to her. White also told plaintiff that the relatives of Emma had not come into his office and her case also "expired." Plaintiff was advised to see the tribal government, but it would tell her the same thing.

At the fourth visitation, neither Caton or White were in the office.

The fifth visitation occurred in the spring of 1975, although the year 1975 was uncertain. Present were plaintiff, her daughter and son-in-law. The firm of White and Caton had ended, and White advised plaintiff that Caton had taken the case and gave them the directions to Caton's office. Plaintiff, her daughter and son-in-law went to Caton's office. Plaintiff did not believe the case had expired because she was not shown the file or the papers of the case. The conversation varied because seven years had passed and memory had faded. The son-in-law was told by Caton that the case was not strong; that plaintiff should contact Joe Benally who would send this case back through the Navajo Tribe and then Caton would discuss the case with plaintiff again. Plaintiff's daughter testified that her mother said: "We came to find out how everything was coming along" and Caton said: "Everything is fine. I'm still working on the case." That was all Caton said.

It was at this visitation that plaintiff knew something was wrong and went to other attorneys.

Caton testified that he evaluated the case, was positive about it, and told plaintiff it was a good case and he would like to handle it on a contingency basis. He wanted to file the suit very badly, prepared a rough draft of a first cause of action, but after discussing the matter with White, he could not ethically do it because he "was in an ambiguous situation." Inasmuch as he felt he did not represent plaintiff, he could not ethically file a complaint on her behalf. He did not retain copies of any letters or contract of employment which he claimed had been mailed to plaintiff and not received by her.

■ Defendants claim that the visitations were with Caton and not White. Perhaps, plaintiff and her family were mistaken. This matter is of no significance. Plaintiff retained the firm of White and Caton. This was equivalent to retaining each member of the firm, although one member of the firm had been consulted. *Bossert Corporation v. City of Norwalk,* 157 Conn. 279, 253 A.2d 39 (1968).

Defendants had done business with Navajo Indians, were familiar with the Indian tradition and the difficulties of translation of the Indian language, and, orally or in writing, defendants had a duty to be precise, meticulous and definite so that no misunderstanding would arise as to the relationship of the parties.

■ No formal contract, arrangement or attorney fee is necessary to create the relationship of attorney and client. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir. 1978); *Farnham v. State Bar,* 17 Cal.3d 605, 131 Cal.Rptr. 661, 552 P.2d 445 (1976); *Kurtenbach v. TeKippe,* 260 N.W.2d 53 (Iowa 1977); *Alexander v. Russo,* 1 Kan.App.2d 546, 571 P.2d 350 (1977); *Tormo v. Yormark,* 398 F.Supp. 1159 (D.N.J.1975); *Crest Investment Trust, Inc. v. Comstock.* 23 Md.App. 280, 327 A.2d 891 (1974); *Bresette v. Knapp,* 121 Vt. 376, 159 A.2d 329 (1960); *Lawrence v. Tschirgi,* 244 Iowa 386, 57 N.W.2d 46 (1953); *Nicholson v. Shockey,* 192 Va. 270, 64 S.E.2d 813 (1951).

The contract may be implied from the conduct of the parties. *Kurtenbach, supra; Lawrence, supra.* All that is required is a statement by an attorney that he would "handle" her matter. *Fuschetti v. Bierman,* 128 N.J.Super. 290, 319 A.2d 781 (1974), or that the work requested will be done "in very good fashion." *Farnham, supra,* or, "it's all been taken care of," *Christy v. Saliterman,* 288 Minn. 144, 179 N.W.2d 288, 294 (1970), or, an attorney's promise "to see what could be done with regard to settlement," *Tormo, supra* [398 F.Supp. at 1169], or, when asked if he would take the case, the attorney said that he would. *Bresette, supra.*

■ The conversations between plaintiff and White were sufficient to meet plaintiff's burden of overcoming the prima facie case made by defendants. Where no contract arrangement was discussed with plaintiff, the fact that the standard in Farmington required a contract arrangement to establish an attorney-client relationship is irrelevant.

Defendants' response is untenable. All facts heretofore set forth were avoided. They rely on their own testimony, and their position is that "To establish the existence of such an attorney-client relationship, the essential terms thereof must be proven by plaintiff. *Setzer v. Robinson,* 386 P.2d 124 (Cal.1962) [sic] [57 Cal.2d 213] 18 Cal.Rptr. 524, 368 P.2d 124." In *Setzer,* the situation is reversed. Setzer, an attorney, sued his client to enforce a contingent fee agreement for legal services rendered and for satisfaction of the lien against his client's property. Setzer could recover because he did not commence any proceedings until his contingent fee agreement was executed. Defendants rely on the following quotation stated in the course of the opinion:

. . . No attorney could safely or reasonably *negotiate* any fee agreement with 'a prospective client without some preliminary investigation of the facts of the case and a disclosure to the prospective client of the legal steps which in his judgment must be taken. *If by the very fact of such investigation and disclosure*

**376**

*the relationship of attorney and client would thereby be created,* the attorney would be placed in the impossible position of becoming the prospective client's attorney *while he was attempting to reach an agreement with him as to whether he should become his attorney or not.* [Emphasis added.] [18 Cal.Rptr. at 526, 368 P.2d at 126.]

The distinction between *Setzer* and the instant case is apparent. In *Setzer,* the attorney investigated the case but did not agree to "handle" the case before a contingent fee agreement was reached. In the instant case, defendants agreed to "handle" the case without negotiations for a contingent fee arrangement. *Westinghouse, supra,* said:

. . . A professional relationship is not dependent upon the payment of fees nor, as we have noted, upon the execution of a formal contract. [580 F.2d at 1317.]

■ A professional relationship exists though the services be rendered gratis. *Allman v. Winkelman,* 106 F.2d 663 (9th Cir. 1939), cited in *Westinghouse, supra.* In other words, a contingent fee arrangement is not an essential term of a contract that establishes an attorney-client relationship.

Defendants' suggestion that plaintiff may have a cause of action against her sister for faulty or improper interpretation placed a duty on defendants to inquire whether the interpreter correctly translated the testimony of plaintiff. In the framework of legal rights and responsibilities, the role of the lawyer has become increasingly crucial. As more individuals come to depend on him, his responsibility must broaden and deepen. An attorney cannot escape obligations by putting the onus on interpreters unless the record shows that the interpreter was disqualified to act.

We hold that a genuine issue of material fact exists on whether an attorney-client relationship was established.

If, upon trial of this issue, the district court remains adamant and finds that no attorney-client relationship was established, judgment shall be entered for defendants on Count I. If the trial court finds that an attorney-client relationship did exist, then the trial court shall make its findings on the remaining issues in this case.

### D. *A genuine issue of material fact exists on defendants' negligence.*

We are not involved with the liability of defendants for negligence in connection with an adversary proceeding in court. This case is limited to the failure of defendants under contract with plaintiff to commence an action within the statutory period of limitations.

To "prosecute" an action includes the commencement thereof, and is not confined to the pursuit of the remedy thereafter. *Cheshire v. Des Moines City Ry. Co.,* 153 Iowa 88, 133 N.W. 324 (1911).

■ When a lawyer contracts to prosecute an action on behalf of his client, he impliedly represents as follows:

(1) he possesses the requisite degree of learning, skill, and ability necessary to the practice of his profession and which others similarly situated ordinarily possess;

(2) he will exert his best judgment in the prosecution of the litigation entrusted to him; and

(3) he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to his client's cause.

■ In addition, a lawyer is subject to the same general rules of law applicable to physicians, dentists and other professional people.

A lawyer is not liable, however, for an error in judgment if he acts in good faith and in an honest belief that his advice and acts are well founded and in the best interests of his clients. *Cook v. Irion,* 409 S.W.2d 475 (Tex.Civ.App.1966); *Hodges v. Carter,* 239 N.C. 517, 80 S.E.2d 144 (1954), 45 A.L.R.2d 1 (1956).

*Davis v. Associated Indemnity Corporation,* 56 F.Supp. 541, 543 (D.C.Pa.1944) adds the following admonition to lawyers:

. . . An attorney must be familiar with the well settled principles of law and rules of practice which are of frequent application in the ordinary business of the profession; must observe the utmost good faith toward his client; and must give such attention to his duties, and to the interests of his client, as ordinary prudence demands, or members of the profession usually bestow. [Citation omitted.]

 We recognize, and give emphasis to the fact that a lawyer is not liable for every mistake that may occur in practice. No lawyer is bound to know all the law. It is not an exact science. There is no attainable degree of skill or excellence at which all differences of opinion or doubts upon questions of law can be removed from the minds of lawyers and judges. If the law on the subject is well and clearly defined and has existed and been published long enough to justify the belief that it was known to the profession, a lawyer who disregards the rule or is ignorant of it renders him liable for losses caused by such negligence or want of skill. *Gimbel v. Waldman,* 193 Misc. 758, 84 N.Y.S.2d 888 (1948).

 All an attorney owes to his client is good faith and reasonable skill and diligence in the prosecution of the case. It does not require expert testimony to establish the negligence of an attorney who is ignorant of the applicable statute of limitations or who sits idly by and causes the client to lose the value of his claim for relief. An attorney who delays the bringing of an action until the statute of limitation has run is guilty of negligence if the attorney did not act solely with a view to promote the interest of his client. *Bland v. Reed,* 261 Cal.App.2d 445, 67 Cal.Rptr. 859 (1968). Ignorance of statutes or rules of limitation of legal remedies can in itself justify a finding of culpable negligence. *Parker-Smith v. Prince Mfg. Co.,* 172 App. Div. 302, 158 N.Y.S. 346 (1916). See *Winter v. Brown,* 365 A.2d 381 (D.C.App.1976). Even plaintiff's settlement and release of an original defendant does not bar plaintiff's claim for damages against partners in

a law firm who failed to obtain service on defendant and negligently permitted plaintiff's course of action to become barred by the statute of limitations, *King v. Jones,* 258 Or. 468, 483 P.2d 815 (1971). *Drury v. Butler,* 171 Mass. 171, 50 N.E. 527 (1898).

*Fuschetti, supra,* says:

. . . The failure of an attorney to commence an action within the time of the statute would ordinarily be considered neglect. [Citation omitted]. Once plaintiff has shown that defendant allowed the statute to run against her claim, defendant should have the burden of coming forward with evidence that the statute would not be a bar. [Citation omitted.] [319 A.2d at 784.]

*Hoppe v. Ranzini,* 158 N.J.Super. 158, 385 A.2d 913, 916 (1978) says:

. . . Failure to file suit before the running of the period of the statute of limitations plainly constitutes malpractice where there is no reasonable justification shown therefor. . . .

Defendants in the instant case did not commence this action because they believed no attorney-client relationship existed. Therefore, it would be unethical for them to locate the plaintiff, and be retained before a complaint could be filed. Caton felt that he "was in an ambiguous situation." He may have been, but he was mistaken. Rule 2–103(A) of the Code of Professional Responsibility reads:

A lawyer shall not recommend employment . . . of himself . . . to a nonlawyer who has not sought his advice regarding employment as a lawyer.

Plaintiff did seek employment of defendants as an attorney. If defendants were in an "ambiguous situation," the Code of Professional Responsibility did not prohibit defendants from contacting plaintiff to resolve the ambiguity. To remain "in an ambiguous situation" for over three years is evidence that defendants did not act in good faith for the best interests of plaintiff, nor exercise reasonable skill and diligence in the prosecution of the case. "[A]s to doubtful matters, an attorney is expected to

perform sufficient research to enable him to make an informed and intelligent judgment on behalf of his client." *Smith v. Lewis,* 13 Cal.3d 349, 118 Cal.Rptr. 621, 628, 530 P.2d 589, 596 (1975).

■ A genuine issue of material fact exists whether defendants were negligent in failing to commence plaintiff's action within the statutory period of limitations.

E. *A genuine issue of material fact exists whether defendants' negligence was the proximate cause of plaintiff's loss.*

■ In a malpractice action charging that an attorney's negligence in prosecuting an action resulted in the loss of the client's claim, the measure of damages is the value of the lost claims, i. e., the amount that would have been recovered by the client except for the attorney's negligence. *Smith v. Lewis, supra; Freeman v. Rubin, supra; McDow v. Dixon,* 138 Ga.App. 338, 226 S.E.2d 145 (1976); *Baker v. Beal,* 225 N.W.2d 106 (Iowa 1975); *Measure and elements of damages recoverable for attorney's negligence, etc.,* 45 A.L.R.2d 62 (1956); 7 Am.Jur.2d, Attorneys at Law, § 190 (1963).

■ Caton evaluated the case. He was very positive about the case. It was a good case. Caton, as an expert witness, should be able to establish the value of the lost claim. The serious, complex problem that arises is the method of establishing the value of the lost claim. In *Hoppe v. Ranzini,* 158 N.J.Super. 158, 385 A.2d 913, 917 (1978) where the cases and authorities are collected, the court said:

The rule elsewhere, although not without exception, appears to be that such a malpractice action against the attorney involves a trial within a trial, in which the plaintiff has the burden of proving by a preponderance of the evidence that (1) he would have recovered a judgment in the action against the main defendant, (2) the amount of that judgment, and (3) the degree of collectibility of such judgment.

. . .

Plaintiff was not burdened with proving the value of the loss claim before trial. In any event, Caton had sufficient knowledge from his investigation to establish that a genuine issue of material fact exists.

■ The best procedure to use is bifurcation with the issue of defendants' neglect being tried first, and the issue of lost value for wrongful death be heard "back to back" with a hiatus of no more than one day. *Fuschetti, supra.* This is practical and logical where both hearings will be tried before the same judge. *See Chocktoot v. Smith,* 280 Or. 567, 571 P.2d 1255 (1977).

Reversed.

IT IS SO ORDERED.

LOPEZ, J., concurs.

HERNANDEZ, J., concurs in result.